**STATE of Missouri, Respondent,**

v.

**Bonnie L. SEGRAVES, Defendant–Appellant.**

**No. 21356.**

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 26, 1997.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jill C. LaHue, Asst. Atty. Gen., Jefferson City, for Plaintiff–Respondent.

GARRISON, Presiding Judge.

Bonnie L. Segraves ("Defendant") was convicted by a jury of second-degree murder for the death of four month old Joshua Blake Haywood ("Blake"), and sentenced to twelve years'· imprisonment. She appeals, contending that there was insufficient evidence to support the conviction. We affirm.

■ In reviewing to determine whether the evidence was sufficient to support the conviction, we accept as true all of the evidence favorable to the verdict, including all favorable inferences drawn therefrom, and disregard all evidence and inferences to the contrary. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo.banc 1989). We do not weigh the evidence, but rather limit ourselves to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.; State v. Villa–Perez,* 835 S.W.2d 897, 900 (Mo.banc 1992). We do not determine the reliability or credibility of witnesses, and we are mindful that the jury was entitled to believe all, part, or none of the testimony of any witness. *Dulany,* 781 S.W.2d at 55. Viewed in that manner, the record discloses the following facts.

Defendant was Blake's babysitter. On November 8, 1994, at about 7:00 a.m., Blake's father brought him to Defendant's home in Kennett, Missouri, where he was to remain until about 1:30 p.m., when his mother was to pick him up. Defendant played with him for a while, and then put him to bed when he became "fussy." At about 10:15 a.m., Defendant called 911, and reported that Blake was not breathing. An ambulance arrived shortly thereafter, and Randy Tiefenauer, a paramedic, found Blake lying face up on the bed. He observed that Blake was cyanotic and had purplish splotches on his face and head, that he was not breathing, and that his skin was cool to the touch. Mr. Tiefenauer began infant CPR, and held him during the trip to Twin Rivers Hospital in Kennett.

Gary E. Brotherton, Asst. Public Defender, Columbia, for Defendant–Appellant.

At the hospital, Blake was attended by Dr. Maynard Sisler, Medical Director of the hospital, and Dr. Teresita Manubay, his regular pediatrician. Dr. Sisler, Dr. Manubay, and other emergency room personnel attempted to resuscitate Blake. These efforts were unsuccessful, and he was pronounced dead. On Blake's Emergency Room Record, Dr. Sisler wrote that the cause of his death was "cardiopulmonary arrest." Dr. Manubay made the following additional entry: "crib death?", and testified that she considered this to be a possible explanation of Blake's death at the time she made the entry.

An autopsy was performed by Dr. Michael Zaricor, a pathologist, who observed no bruises or other signs of physical abuse. He noted that the lividity, or settling of blood after death, was on the front of the body, which indicates that Blake died lying on his stomach on a flat surface. Dr. Zaricor's internal examination of the body revealed hemorrhages in the sternomastocleidoid, or "strap" muscles on both sides of the neck,[1] at the base of the tongue, and in the muscles at the back of the neck at the base of the skull. The hemorrhages in the neck were located deep within the surrounding muscle, were "in the classic position for the fingers of someone who grabs anyone by the neck," and, in Dr. Zaricor's opinion, indicated that Blake had been manually strangled. The doctor ruled out Sudden Infant Death Syndrome ("SIDS"), or "crib death" as the cause of death because the hemorrhages in the neck and tongue were inconsistent with that diagnosis.

Dr. Zaricor consulted Dr. Michael Graham, a forensic pathologist, who was Chief Medical Examiner for the City of St. Louis, a Certified Child Death Pathologist with the Missouri Child Fatality Review Program, and had published several scholarly papers related to SIDS and the investigation of infant deaths. Dr. Graham confirmed Dr. Zaricor's findings about the cause of death after reviewing the autopsy photographs, microscopic slides and report. He agreed that the

hemorrhages in the neck and tongue would preclude a diagnosis of SIDS.

In her sole point on this appeal, Defendant contends that the trial court erred in overruling her motion for judgment of acquittal at the close of all of the evidence, and in sentencing her because the State did not prove beyond a reasonable doubt that Blake's death resulted from a crime. In support, she relies on a conflict between the evidence presented by the State and that presented by her.

At trial, Defendant maintained her innocence, and argued that SIDS was the true cause of Blake's death. She testified that when she checked Blake after putting him down for a nap, he was lying face down. When she turned him over, she saw that he was blue, and apparently not breathing. She had babysat Blake several times before and the record contains no evidence that she had ever mistreated him in any way prior to the day of his death.

Defendant's expert, Dr. Frank Peretti, a forensic pathologist and Medical Examiner for the State of Arkansas, reviewed the records associated with Blake's death, including Dr. Zaricor's and Dr. Graham's findings, and testified that SIDS was the cause of death. Dr. Peretti also observed that no findings typically associated with strangulation, other than the hemorrhages in the neck and tongue, were present in Blake's body. Contrary to the testimony of Dr. Zaricor and Dr. Graham, Dr. Peretti concluded that these hemorrhages were "artifactual," or the result of trauma unrelated to the actual cause of death. An artifact may result from efforts to resuscitate the patient, mishandling of the body, or other external conditions unrelated to the cause of death. Dr. Peretti opined that the hemorrhages were the result of efforts to resuscitate Blake and of the manner in which his body was positioned prior to and during the autopsy.

Mr. Tiefenauer, Dr. Sisler, Dr. Manubay, and the other emergency medical personnel all testified that they neither exerted pressure on Blake's neck themselves, nor saw any of their colleagues do so. Dr. Manubay, who

---

1. The strap muscles are attached to the middle of the clavicle, and run from the sternum to the base of the skull behind the ears.

 

intubated Blake during the resuscitation efforts, testified that this process went without incident, and was unlikely to cause any hemorrhaging at the base of the tongue. The Dunklin County Coroner testified that he did not touch Blake's neck, and that he placed the body on a pillow when he transported it from the hospital to Dr. Zaricor. While Dr. Graham testified that he would have performed the autopsy differently from Dr. Zaricor, he stated that the hemorrhages in the neck and tongue were too extensive to be artifacts of resuscitation or of the autopsy itself.

The *corpus delicti* in a homicide comprises two parts: a person's death and the criminal agency of another. *State v. Frappier*, 941 S.W.2d 859, 862 (Mo.App. S.D. 1997). Defendant argues that the evidence presented at trial was insufficient to allow a reasonable juror to find that Blake's death resulted from a criminal act. We disagree. The prosecution presented extensive evidence at trial to support its theory that Blake had been strangled. Dr. Zaricor, who performed the autopsy, and Dr. Graham both testified that the autopsy results indicated strangulation, and precluded a diagnosis of SIDS. Defendant implies that Dr. Peretti's disagreement with their findings prevents a reasonable juror from concluding that Blake was strangled. However, the jury was free to believe Dr. Zaricor's and Dr. Graham's explanation of Blake's death over Dr. Peretti's, and was similarly entitled to disbelieve Defendant's account of the events surrounding his death. *State v. Dulany*, 781 S.W.2d at 55. We hold that sufficient evidence supports the jury's conviction.

The judgment is affirmed.

PREWITT and CROW, JJ., concur.